**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**A. Gordon ELDRED,**
**Defendant-Appellant.**

No. 77–3246.

United States Court of Appeals,
Ninth Circuit.

Dec. 28, 1978.

Oscar B. Ladner, Gulfport, Miss., for defendant-appellant.

E. G. Noyes, Jr., Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before WRIGHT and CHOY, Circuit Judges, and POOLE, District Judge.*

PER CURIAM:

Eldred appeals his conviction for intentional misapplication of funds belonging to the Navajo Housing Authority (18 U.S.C. § 1163), conspiracy to defraud the United States (18 U.S.C. § 371), transportation in interstate commerce of securities valued in excess of $5,000 knowing them to have been obtained by fraud (18 U.S.C. § 2314), and aiding and abetting (18 U.S.C. § 2). He contends that multiple errors in the course of his jury trial denied him a fair trial. We affirm.

* Of the Northern District of California.

In 1974, Eldred, representing the American Funding Corporation (AFC), entered into an oral agreement with Pat Chee Miller, executive director of the Navajo Housing Authority (NHA),[1] and Leslie Joel Hadden, Vice President and General Manager of Window Rock Constructors, Inc., a company that had completed several construction contracts on the Navajo Reservation. Under the agreement, Eldred offered to invest excess NHA funds in certificates of deposit at a higher rate than that offered by local banks. In return, Hadden and Miller were to split kickbacks in the form of "finders' fees" of 1% of the funds invested. Mervin Schaffer, head of the AFC, was to receive another 1%. During the remainder of 1974, Miller invested $13,297,161.74 with Eldred.[2]

There was no written agreement between the parties, no written memorandum, and no receipts for funds. Miller received small amounts as kickbacks until December 1974. About that time, Eldred stated that Miller and Hadden would split a finder's fee of about $144,000.

By July 1975, Miller was concerned because he had not received the amount promised. He and Hadden met with Eldred in Los Angeles. Eldred said that the three of them would split the money three ways and that Miller would receive $25,000. Eldred also told Miller that there would be an additional distribution later in the year. In October, Miller received from Hadden $10,000; in November, an additional $3,000; and in December, $1,500.

## I.

## PARTICIPATION BY TRIAL JUDGE AT TRIAL

Eldred first claims that he was denied a fair trial because of the court's excessive participation in the trial. He contends that the court repeatedly belittled defense counsel in the presence of the jury, intimidated defense counsel so as to deny Eldred his right to effective assistance, demonstrated marked bias in questioning witnesses, and exhibited disbelief of Eldred's testimony in a manner calculated to influence the jury. None of these claims has merit.

■ A trial judge must constantly be aware of the sensitive role he plays in a jury trial and avoid even the appearance of advocacy or partiality. *See, e. g., United States v. Calhoun*, 542 F.2d 1094, 1105 (9th Cir. 1976). However, as Mr. Justice Frankfurter observed, "federal judges are not referees at prize-fights but functionaries of justice." (*Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948). They are not expected to sit mute and impassive, speaking only to rule on motions or objections. *See Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946).

■ A trial judge may participate in the examination of witnesses for the purpose of "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." *United States v. Malcolm*, 475 F.2d 420, 427 (9th Cir. 1973). Unless his intervention prejudiced the accused, we must affirm. Fed.R.Crim.P. 52(b).

## A. BELITTLING DEFENSE COUNSEL.

Eldred cites 19 incidents in a record of more than 1,000 pages to support his claim that the trial judge disparaged and criticized defense counsel. Four of these incidents occurred when the court asked de-

1. NHA is a Native American tribal organization engaged, among other things, in the construction of low-rent housing on the Navajo Indian Reservation. Funds for NHA come from the Department of Housing and Urban Development pursuant to agreements that require the funds to be invested in reliable liquid securities such as treasury bills, notes, certain bonds, and time certificates of deposits (CD's). Before the events in this case, NHA funds were invested exclusively in CD's at various local banks.

2. It appeared at trial that, contrary to the agreement, Eldred never invested the NHA money in certificates of deposit or similar securities.

fense counsel to stop questioning a witness on matters about which the witness had no knowledge. The court once instructed defense counsel to proceed after exhausting the same subject with a witness for the third time. On another occasion the court asked defense counsel to proceed after covering a matter with a witness for the fourth time.

Five of the alleged incidents involved the court's attempts to ascertain the relevance and admissibility of a specific line of questioning. On four occasions the court ruled on objections concerning lack of proper foundation and improper impeachment. On another occasion the court asked whether defense counsel objected to the admission into evidence of a government exhibit and was told that counsel did not.

The remaining instances defy characterization and show little more than the judge's attempt to confine the evidence to relevant matters. Taken collectively, they show only the routine interplay between court and counsel during the course of a lengthy and complex trial.

■ As we have stated, "[t]o warrant a reversal because of the conduct of the trial judge in rebuking or punishing an attorney during the trial, it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party." *Paddock v. United States*, 320 F.2d 624, 627 (9th Cir. 1963) (quoting *Newman v. United States*, 28 F.2d 681, 683 (9th Cir. 1928)). It is clear from this record that the comments by the judge to defense counsel were neither calculated to disparage Eldred in the eyes of the jury (*Paddock v. United States*, 320 F.2d at 627), nor likely to affect the outcome of the trial.

### B. INTIMIDATION OF DEFENSE COUNSEL.

■ Eldred also cites instances that purportedly demonstrate judicial efforts to intimidate and unnerve counsel. He argues that the effect was to render counsel incapable of assisting his client effectively.

Many of the supporting references are identical to those complained of above. In addition, he complains of words spoken by the trial court outside the presence of the jury. Although blunt and probably ill-considered, they could not have influenced the jury, having taken place outside its presence.

■ Moreover, the record clearly shows that Eldred received effective assistance of counsel, well "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) (en banc).

### C. EXAMINATION OF WITNESSES.

Eldred contends that the court's intrusion into the examination of Hadden, who testified under a grant of immunity, was prejudicial and improperly usurped the prosecutor's role. Eldred notes that in the 184 pages of testimony by Hadden the court interrupted 18 times and asked a total of 86 questions of the witness.

■ It is proper for the court to question witnesses to clarify and develop facts, as long as the questioning is done in a nonprejudicial fashion and the court does not adopt a partisan stance. *See Glasser v. United States*, 315 U.S. 60, 82–83, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Sidman*, 470 F.2d 1158, 1162–63 (9th Cir. 1972), *cert. denied*, 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *McConney v. United States*, 421 F.2d 248, 250 (9th Cir. 1969), *cert. denied*, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970); *Robinson v. United States*, 401 F.2d 248, 252 (9th Cir. 1968).

■ The examination of Hadden shows that the court was trying to clarify testimony that at times was confused, imprecise, and in need of clarification. For example, the court sought to clarify the amount of money Hadden had given to Miller in kickbacks.

The court also corrected defense counsel during cross-examination, observing that statements made earlier by Hadden were not under oath and that an admission that defense counsel intimated Hadden had made to F.B.I. agents was not in the agent's report. Nothing the judge said suggested that he was adopting a partisan role.

Though the remarks by the court may have had some effect in diminishing the thrust of the attempted impeachment, they were clearly proper and fell far short of the assumption of the prosecutor's role criticized in *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933).

### D. INTERRUPTION OF ELDRED'S TESTIMONY.

█ Eldred alleges that the trial court's frequent interruption of his testimony exhibited an attitude of disbelief, mockery, and disrespect calculated to influence the jury against Eldred. However, the majority of these were designed to clarify and elicit testimony before the jury. Nothing the judge said suggested that he did not believe Eldred or was hostile to him.

From our hindsight we might say that a greater reluctance to intervene may have been warranted, but we conclude that the court's conduct does not amount to reversible error. *Cf. United States v. Allsup*, 573 F.2d 1141 (9th Cir. 1978) (conduct amounting to reversible error); *United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974) (reversible error).

In sum, the trial judge's intervention throughout the trial was at no single point nor cumulatively so prejudicial as to deprive Eldred of a fair trial. Furthermore, any possible taint caused by the court's conduct was dissipated by admonitions to the jury following its questioning of witnesses and in jury instructions at the close of the trial. Even were we to conclude that the trial court overstepped its proper boundaries, any error was clearly harmless.

### II.

### PREJUDICIAL PUBLICITY

Eldred asserts that the trial judge erred in refusing to grant a change of venue or, alternatively, a continuance due to prejudicial pretrial publicity.[3] He also alleges error in the denial of an order restraining publicity during trial.

Pretrial publicity consisted of two newspaper articles about matters related to the case. One was published more than a year before the trial began, and consisted of allegations of wrongdoing in financial dealings between NHA and AFC. The other came nearly four months before trial, when Pat Chee Miller pleaded guilty to accepting kickbacks.

█ The trial judge has "large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Silverthorne v. United States*, 400 F.2d 627, 637 (9th Cir. 1968). Here, the judge directed a few inquiries about publicity to the panel of prospective jurors and uncovered no potential prejudice. In light of the kind of publicity and the length of time that had elapsed before the trial began, he need not have interrogated the prospective jurors more extensively.

█ When possible prejudicial publicity occurs during trial, the court has "the affirmative duty . . . to take positive action to ascertain the existence of improper influences on the jurors' deliberative qualifications and to take whatever steps are necessary to diminish or eradicate such improprieties." *Silverthorne v. United States*, 400 F.2d at 643. During this trial the judge repeatedly admonished the jury to avoid news about the case. It does not appear that any media publicity ever developed during trial, and there was thus no need for a restrictive order.

The trial judge did not abuse his discretion in his handling of publicity before and during trial.

3. It appears that the judge did not deny the motion for change of venue at all. Rather, the motion was withdrawn before the court ruled on it.

## III.

### THE JURY SEPARATION

Eldred asserts that the court erred in refusing to sequester the jury during its deliberations which began on the afternoon of Thursday, July 14, 1977. Before the jury retired, the court instructed that, if the jurors had no verdict by six o'clock, they should so advise the bailiff and then be excused for the evening. They did so. The next day the jury deliberated until 5:00 p.m. and then announced it could not reach a verdict. The court suggested more time for weekend reflection. The jury returned Monday morning and announced 40 minutes later a verdict finding Eldred guilty on all counts.

Eldred argues that the failure to admonish and sequester the jury constituted plain error and an abuse of discretion by the trial judge. He also alleges that the trial court erred in not inquiring of the jurors upon their return.

 The trial judge has wide discretion in determining whether a jury may recess during deliberations. *See United States v. Menna*, 451 F.2d 982, 984 (9th Cir. 1971), *cert. denied*, 405 U.S. 963, 92 S.Ct. 1170, 31 L.Ed.2d 238 (1972); *Sullivan v. United States*, 414 F.2d 714, 715 (9th Cir. 1969). Here, the judge repeatedly admonished the jurors before and during their deliberations to avoid all publicity and not to discuss the case among themselves or with others during recess. There was no showing of juror misconduct or disregard of these instructions. Eldred only speculates that the speed with which the jury reached a verdict upon returning created a presumption of exposure to prejudicial influence during its separation. The trial judge did not abuse his discretion in refusing to sequester the jury or subject them to voir dire after the weekend recess.

4. The Rule has since been amended to make explicit that it allows postverdict interviews with jurors "only upon the showing of good

## IV.

### DENIAL OF JURY INTERVIEW

 Eldred complains that the judge erroneously refused his motion, pursuant to District Local Rule 12(b), to interview the jurors. The court, in denying Eldred's request, construed the rule to require some showing of sufficient reason to propound interrogatories to the jury after the verdict.[4] Eldred made no such showing. Indeed, nothing in the record supports a suspicion of misconduct. The fact that the jury once announced a deadlock is not such a reason. *See United States v. Peterson*, 549 F.2d 654, 659 (9th Cir. 1977).

 The jurors were under oath. Faithful performance of their official duties is presumed. *Cavness v. United States*, 187 F.2d 719, 722 (9th Cir. 1951). No constitutional or statutory deprivation of rights occurred. The trial judge therefore did not abuse his discretion in refusing to allow postverdict interrogation of jurors. *United States v. Stacey*, 475 F.2d 1119 (9th Cir. 1973).

## V.

### MOTION FOR A NEW TRIAL

Eldred's final contention is that the court erred in not granting a new trial for newly discovered evidence. After verdict, on the day of sentence, Stephen Miller was succeeded as counsel of record by Oscar Ladner, Eldred's counsel on appeal. Apparently without consulting Miller, Ladner moved for a new trial for newly discovered evidence.

The motion alleged that Eldred had been deprived of the testimony of Harvey Sitzer, an essential witness on his behalf, because the government attorney had advised Miller that: "If you put Harvey Sitzer on the witness stand, I will have him indicted." The only support for the motion was Eldred's affidavit. After a hearing on the allegation, the trial court denied the motion for a new trial.

cause." U.S.Dist.Court, Dist. of Ariz., Rules of Practice 12(b), (amended Nov. 1, 1977).

A motion for new trial based on newly discovered evidence is addressed to the sound discretion of the trial court and may be granted "if required in the interest of justice." Fed.R.Crim.P. 33. A substantial burden rests on the movant to demonstrate an abuse of discretion. *United States v. Brashier*, 548 F.2d 1315, 1327 (9th Cir. 1976); *United States v. Diaz-Rodriquez*, 478 F.2d 1005, 1007 (9th Cir.), *cert. dismissed*, 412 U.S. 964, 93 S.Ct. 3024, 37 L.Ed.2d 1013 (1973); *United States v. Clay*, 476 F.2d 1211, 1215–16 (9th Cir. 1973).

It must appear from the motion and affidavits that: (1) the evidence relied on is in fact newly discovered; (2) the movant has been diligent; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) a new trial probably would produce an acquittal. *United States v. Brashier*, 548 F.2d at 1327; *United States v. Cervantes*, 542 F.2d 773 (9th Cir. 1976).

Everything raised in Eldred's motion was known to his counsel at the time it occurred. The evidence is clearly not newly discovered. Moreover, it is not clear that the evidence if admitted would probably have produced an acquittal. Indeed, it seems likely that Sitzer would have refused to speak for fear of self-incrimination and no testimony would have been elicited from him. The court did not abuse its discretion in denying appellant's motion for a new trial.

Affirmed. The mandate will issue at once. Release on bail is revoked now.