**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert J. MISKINIS, Defendant–Appellant.**

No. 90–50025.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1991.

Decided April 10, 1992.

Joseph Milchen, Frank & Milchen, San Diego, Cal., for defendant-appellant.

Judith S. Feigin, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before: BROWNING, FERGUSON, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Robert J. Miskinis appeals his conviction and sentence for engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848; conspiracy to aid and abet the manufacture of methamphetamine and possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; aiding and abetting the manufacture of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and aiding and abetting interstate travel in aid of racketeering enterprises, in violation of 18 U.S.C. §§ 2, 1952(a)(3). We hold that section 848 of Title 21, the federal "kingpin" statute, may be applied to one whose criminal conduct consists solely of aiding and abetting the criminal conduct of others, if that individual is otherwise a kingpin in his own right, and if the criminal conduct aided and abetted itself qualifies under that section. We further conclude that the facts pertaining to Miskinis's ineffective assistance of counsel claim are insufficiently developed to allow consideration of that claim on direct appeal.[1]

## I

In June, 1978, Miskinis attended a lecture given by DEA Agent William Yout about the DEA's precursor chemical control program. After the lecture, Miskinis approached Yout and stated that he saw an opportunity to earn large sums of money by supplying precursor chemicals to drug traffickers. Miskinis told Yout that he planned to open a chemical supply house, buy chemicals at wholesale prices, and sell them to traffickers at outrageous prices. Yout warned Miskinis that he could go to jail for operating such a business, but Miskinis chose to ignore the warning.

---

**1.** Miskinis raises a number of other issues which we resolve in a separate memorandum disposition filed concurrently herewith. 959 F.2d 243.

From 1979 until his arrest in 1988, Miskinis operated RJM Labs, a chemical supply company with stores in San Diego and Los Angeles Counties. Until 1982, the most common method of manufacturing methamphetamine used P2P, a chemical made from the precursor phenylacetic acid. On January 1, 1983, the state of California listed phenylacetic acid as a controlled chemical and instituted a reporting requirement and a twenty-one day waiting period for all purchases. Once sales of phenylacetic acid became reportable, RJM stopped selling it.

In the early 1980's, a new process was developed to manufacture methamphetamine using ephedrine, hydriodic acid, and red phosphorous. The combination of those three chemicals is useful only for manufacturing methamphetamine. Between 1982 and 1984, sales of ephedrine, hydriodic acid, and red phosphorous constituted 90% of RJM's business. In 1982, the DEA wrote to RJM in order to advise it that those chemicals were used for manufacturing illegal drugs, and to ask that RJM notify the DEA of sales of those chemicals. RJM never responded to the DEA's request. In January, 1987, San Diego County listed ephedrine as a controlled substance. Prior to January, 1987, RJM made 85.5% of its sales from its San Diego store. After the law changed, 93.6% of RJM's sales were made in North Hollywood.[2] On April 1, 1987, sales of ephedrine became reportable statewide. At that point, RJM stopped selling the chemical.

It was RJM's stated policy not to sell to anyone who announced that he would use the chemicals purchased from RJM to manufacture illegal drugs. However, Miskinis required that his employees remove all labels on chemicals sold by RJM before delivering those chemicals to customers. He explained to one customer that he did not want his name on the packages because "[s]ome of this stuff gets busted." Virtually all sales were for cash, and RJM did not take customer names or ask for identification. Instead, customers were known by code names such as "Her", "Big Guy", and "Chief". When California enacted a law requiring that all chemical transactions over $10,000 be reported, Miskinis posted a notice in the store explaining the new requirements. RJM's customers then divided their purchases to avoid the reporting requirement. In 1986, a series of newspaper articles reported that ephedrine, hydriodic acid, and red phosphorous were the ingredients for making methamphetamine, and indicated that those items could be purchased at RJM. From that point onward, Miskinis required that employees write receipts for hydriodic acid separately from receipts for other purchases.

Between January, 1984, and August, 1985, DEA agents seized approximately 130 methamphetamine labs in San Diego County. Only one did not buy products from RJM. Other RJM customers came from as far away as Montana and South Dakota. Surveillance at RJM established that the typical RJM customer dressed poorly, parked away from the store, and drove in a counter-surveillance manner. In more than fifty surveillances, the DEA never saw an RJM customer proceed to a legitimate chemical business.

Miskinis also owned Safe Lab, a company set up to develop and market safe laboratory equipment. Unlike the RJM customers, the Safe Lab customers gave their names and identification and were billed for their purchases. RJM had one employee working at Safe Lab, however, and this employee had a separate phone line that the Safe Lab employees were not allowed to use.

In August, 1988, DEA agents executed a search warrant at Miskinis's home. They found notes in Miskinis's handwriting concerning synthesis of a precursor for methamphetamine entirely from non-reportable, non-controlled chemicals. A federal grand jury subsequently returned a fifteen-count indictment against Miskinis. Two counts were dismissed and a third severed prior to trial. After a jury trial, Miskinis was convicted on one count of engaging in a con-

---

**2.** RJM's largest customer testified that Miskinis personally advised her to go to the North Hollywood store in order to avoid the reporting ordinance.

tinuing criminal enterprise, in violation of 21 U.S.C. § 848; one count of conspiracy to aid and abet the manufacture of methamphetamine, as well as possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; seven counts of aiding and abetting the manufacture of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and two counts of aiding and abetting interstate travel in aid of racketeering enterprises, in violation of 18 U.S.C. §§ 2, 1952(a)(3). The district court sentenced Miskinis to a forty-year term of incarceration followed by five years of supervised release, and also imposed a fine of $250,000 in connection with Count One, engaging in a continuing criminal enterprise.

Prior to indictment, during the grand jury investigation of Miskinis, a former RJM employee named Don Zecher was called as a witness. Zecher stated that Miskinis had told him that he had consulted criminal defense attorney John Mitchell, and that Mitchell had assured Miskinis that RJM was "doing nothing wrong." After Miskinis was indicted, he retained Mitchell as his defense counsel. When the prosecutor advised Mitchell of Zecher's grand jury testimony, Mitchell denied that the alleged conversation had ever taken place.

In preparing Zecher to testify as its witness at trial, the prosecution learned more details of the alleged conversation. Zecher claimed that as early as 1984 he had asked Miskinis whether RJM's business was legal, and that Miskinis told him that Mitchell had said: "Don't worry about it. Just go out and make a lot of money." According to Zecher, Miskinis described Mitchell as one of the city's most experienced criminal defense attorneys.

At trial, the government sought to introduce Zecher's testimony and then establish that Mitchell had never made the statements. In its brief, the government states that this strategy was intended to refute in advance a potential advice of counsel defense. In chambers, the government suggested two possible methods of establishing that Mitchell had not made the statements without having Mitchell testify against his client. First, the government offered to stipulate that Mitchell, if called to testify, would deny that the alleged conversation had occurred. Alternatively, the government said it could present Zecher's testimony that Miskinis claimed that he had consulted with a prominent defense attorney, along with a stipulation that the prominent defense attorney would deny that any such consultation took place. Mitchell objected to both alternatives, on the ground that the first would, in effect, require him to testify against his client, and the second would allow the government to argue that Miskinis had lied to Zecher about the conversation. The district court agreed with Mitchell and ruled that no reference to Mitchell or to "a prominent defense attorney" could be made.

Another attorney, John Chester, subsequently testified that Miskinis had consulted him regarding the legality of RJM's sales practices. Chester stated that he had advised Miskinis that RJM was not violating the law, but further testified that Miskinis did not tell him about certain of RJM's practices, such as the use of code names for customers. More important, Chester noted that his area of legal expertise was taxation, not criminal law. Chester's testimony thus did not establish a viable advice of counsel defense. Chester also stated that he knew Mitchell and had referred criminal cases to him, but that he did not consult Mitchell about Miskinis's activities and Miskinis never requested that he do so.

## II

Miskinis argues that 21 U.S.C. § 848, the federal "kingpin" statute, which authorizes severe penalties for a person convicted of operating a continuing criminal enterprise, may not be applied to one who merely aids and abets criminal activity.[3] He relies on

---

3. Section 848 provides, in relevant part:
    "[A] person is engaged in a continuing criminal enterprise if—

    (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

*United States v. Amen,* 831 F.2d 373 (2d Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988), in which the Second Circuit held that section 848 does not create heightened liability for an individual charged with aiding and abetting a kingpin. Miskinis maintains that because the conduct with which he was charged amounted at most to aiding and abetting RJM customers in the manufacture of methamphetamine, his conviction under the kingpin statute should be reversed. We disagree.

Section 2(a) of Title 18 provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a) (1988). The question whether section 848 may be applied to one who aids and abets criminal activity is in fact two distinct questions. First, may an individual whose only criminal conduct consists of aiding and abetting a kingpin be convicted under section 848? Second, does section 848 apply to one who otherwise qualifies as a kingpin, but whose criminal conduct consists exclusively of aiding and abetting the criminal activity of others? Neither of these questions has been directly addressed by this circuit.

■ With respect to the first question, the Second and Seventh Circuits have reached opposite conclusions. In *Amen,* the Second Circuit held that because section 848 represents an express congressional decision to single out ringleaders of large narcotics operations for special punishment, the statute does not apply to one who simply aids and abets a kingpin. 831 F.2d at 381–82. In *United States v. Pino–Perez,* 870 F.2d 1230 (7th Cir.1989) (en banc), *cert. denied,* 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 209 (1990), a nine-judge majority of the Seventh Circuit criticized *Amen* as an unprecedented departure from the rule that aider and abettor liability

under section 2(a) of Title 18 attaches automatically to every federal criminal statute. The *Pino–Perez* majority noted that "[t]he question is not whether section 2(a) is applicable—it always is. The question is whether a given accomplice is an aider and abettor." *Id.* at 1233–34. The majority concluded that, although the language and legislative history of section 848 preclude criminal liability for *subordinates,* such liability can extend to one who aids and abets a kingpin in some other capacity.

While we have considerable difficulty with the approach adopted by the Seventh Circuit, there is no need to decide the first question here. As the government points out, Miskinis was charged and convicted as a kingpin, not as an aider and abettor of a kingpin. By the sum of his actions—making the precursor chemicals for methamphetamine available for cash with the knowledge that they would be used for an illegal purpose, and taking affirmative steps to enable RJM customers to conceal their identity from DEA investigators, to evade surveillance, and to avoid the applicable reporting requirements—Miskinis significantly aided and abetted virtually every manufacturer of methamphetamine in San Diego County as well as many in other areas. Miskinis's reliance on *Amen* is therefore misplaced.

■ Faced with circumstances similar to those presented here, the Second Circuit concluded that an aiding and abetting offense may serve as a series predicate for a section 848 conviction. *United States v. Aiello,* 864 F.2d 257, 264 (2d Cir.1988) ("We do not read our earlier opinions to shield kingpins from [continuing criminal enterprise] liability solely because they are convicted as aiders and abettors rather than as principals with regard to the predicate crimes."). The reasoning employed by the *Aiello* court applies with equal force where all of the predicate crimes charged in an

---

(2) such violation is a part of a continuing series of violations of this chapter or subchapter II of this chapter—
    (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a

position of organizer, a supervisory position, or any other position of management, and
    (B) from which such person obtains substantial income or resources."
21 U.S.C. § 848(c).

indictment under section 848 are aiding and abetting offenses. We therefore hold that section 848 may be applied to one whose criminal conduct consists solely of aiding and abetting the criminal conduct of others, if that person is otherwise a kingpin in his own right, and if the criminal conduct aided or abetted would itself qualify under that section.

### III

Miskinis contends that the events surrounding the attempt to introduce Zecher's grand jury testimony created a conflict of interest between Miskinis and his trial counsel, Mitchell, thereby depriving Miskinis of his sixth amendment right to effective assistance of counsel. We agree with Miskinis that a serious question exists as to whether Miskinis received effective assistance of counsel. However, the record is not sufficiently developed to allow us to determine on direct appeal whether an actual conflict of interest existed.

In order to prevail on an ineffective assistance of counsel claim based on conflict of interest, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). The Court has made clear that "adverse effect" is not equivalent to prejudice. *Id.* at 349–50, 100 S.Ct. at 1718–19. Although a defendant who raises an effective assistance of counsel claim is ordinarily required to show prejudice, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), prejudice is presumed if the alleged violation is based on an actual conflict of interest, *id.* at 692, 104 S.Ct. at 2067. As the Court has explained:

> [A] rule requiring a defendant to show that a conflict of interests ... prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application. In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of as-

sessing the likelihood that the error materially affected the deliberations of the jury. But in a case [involving a conflict of interest] the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.

*Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978); *see also United States v. Tatum*, 943 F.2d 370, 375–76 (4th Cir.1991).

Our concern in this case is not that Miskinis has shown no adverse effect on Mitchell's performance as his trial counsel. Assuming that an actual conflict of interest existed, it seems clear that he can do so. To establish that a conflict of interest adversely affected counsel's performance, the defendant need only show that some effect on counsel's handling of particular aspects of the trial was "likely". *Mannhalt v. Reed*, 847 F.2d 576, 583 (9th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). As in *Mannhalt*, there are a number of areas in which an actual conflict of interest between Miskinis and Mitchell likely would have affected Mitchell's advocacy. These include: (1) Mitchell's failure to put on an advice of counsel defense using Zecher's testimony; (2) Mitchell's refusal to testify regarding the conversation reported by Zecher; and (3) Mitchell's failure to put Miskinis on the stand to testify regarding the alleged conversation. Assuming that an actual conflict of interest existed, Miskinis has satisfied the *Cuyler* test.

On the present record, however, we are unable to ascertain with sufficient certainty whether Mitchell's defense of Miskinis created such a conflict. At no point during the trial or during the pretrial or other proceedings did Miskinis testify on his own behalf or submit any verified or other statement. Accordingly, whether Miskinis would have confirmed Zecher's testimony is, at this point, a matter for sheer speculation. It is entirely conceivable that Miskinis would have denied that he

ever consulted Mitchell about the legality of RJM's business practices.

Because the resolution of ineffective assistance of counsel claims ordinarily requires the development of facts outside the original record, "[t]he customary procedure for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255." *United States v. Birges,* 723 F.2d 666, 670 (9th Cir.), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984). In light of the need for Miskinis's testimony, we conclude that collateral review provides the appropriate forum for his ineffective assistance of counsel claim.[4] We emphasize that there is no fixed rule against determining the ineffectiveness question on direct appeal where the record so permits. Rather, the decision to defer resolution of an ineffective assistance of counsel claim is a discretionary one and depends upon the contents of the record in a particular case. *Id.* (noting that *"usually* such a claim cannot be advanced without the development of facts outside the original record" and that "in the present case, the record is not sufficient for us to analyze the effectiveness of Birges' counsel") (emphasis added). Because we cannot resolve Miskinis's ineffective assistance of counsel claim on the present record, such a deferral is in order here. We will, however, retain jurisdiction over any subsequent appeals in this or any related collateral matter.

The issue that a district court would be required to determine on collateral review is whether Miskinis would have taken advantage of an advice of counsel defense but for Mitchell's representation of him at the trial. This is a different question than whether Miskinis's statements to Zecher were true. If Mitchell's testimony, had he been called and testified, would have been adverse to a defense that Miskinis might have offered, a conflict of interest existed.

The conflict would have been particularly acute if the advice Mitchell supposedly gave would have constituted a violation of the rules of professional ethics. "[T]he presumption of prejudice extends to a conflict between a client and his lawyer's personal interest." *Mannhalt,* 847 F.2d at 580 (citations omitted).

We also note that the circumstances surrounding the advice of counsel issue raise troubling questions about the conduct and motivation of the government. In particular, while it may not have been unreasonable for the government to ask Mitchell whether he intended to put on an advice of counsel defense, it is unclear why the government would attempt to introduce testimony relating to such a defense in its case in chief once it had determined that Mitchell did not intend to do so. The government states that it sought to introduce Zecher's testimony to refute a potential advice of counsel defense. We find this explanation wholly unpersuasive. The district court may wish to inquire further into this matter on collateral review. At that time it may also wish to ask whether after Zecher's grand jury appearance the government made Mitchell a target of the investigation.

Miskinis's conviction under section 848 is AFFIRMED. Jurisdiction over any subsequent appeals in this or any related collateral proceeding shall remain with this panel.

---

**4.** Miskinis further argues that as a result of the conflict of interest between himself and Mitchell, he was deprived of his constitutional right to testify in his own defense. He contends that because the district court was aware of the conflict, the court was required to advise him of his right to testify and should not have presumed that Mitchell would do so. In light of our ruling on Miskinis's conflict of interest claim, we do not reach this issue. Miskinis may raise this argument in a collateral attack on his conviction if he so chooses.