George MAIDEN, Jr., Petitioner–
Appellant,

v.

William BUNNELL; John Van De
Kamp, Respondents–Appellees.

No. 93–15861.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 15, 1994.

Decided Sept. 19, 1994.

Robert W. Rainwater, Asst. Federal Public Defender, Fresno, CA, for petitioner-appellant.

Garrick W. Chock, Deputy Atty. Gen., Sacramento, CA, for respondents-appellees.

Before FLETCHER and Stephen S. TROTT, Circuit Judges, and KING,* Senior District Judge.

FLETCHER, Circuit Judge:

George Maiden appeals the district court's denial of his petition for a writ of habeas corpus. Maiden was convicted in state court of first degree murder and attempted robbery. His defense attorney at trial formerly worked as a prosecutor and had successfully brought a felony burglary prosecution against Maiden three years earlier. Maiden argues that this was an impermissible conflict of interest which violated his Sixth Amendment right to effective assistance of counsel. He also argues that his Sixth Amendment right to a fair trial was violated by certain statements made by the trial judge in the presence of the jury.

We affirm.

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

## I

In May, 1974, a clerk at the Metropole Liquor Store was fatally shot during an attempted robbery. The next day a woman called the police and stated that her boyfriend, George Maiden, had told her he shot and killed a person during a failed attempt to rob a liquor store. Maiden was arrested the following day.

At a photographic lineup, the two eyewitnesses to the murder failed to make a positive identification. At a subsequent live lineup, one witness singled out both Maiden and another man with about equal certainty, and the second picked Maiden but, in an attempt to be cautious, suggested that there was a slight possibility that the perpetrator might be the other person identified by the first eyewitness.

A gun was located which experts concluded was probably the murder weapon. The gun was traced through a twisted chain of possession that included a number of Maiden's friends, one or two of whom had possession of the gun and were with Maiden during the time frame in which the murder was committed. The gun was never conclusively tied to Maiden himself.

During jury selection, the court conducted voir dire of a potential juror, Jack D. Wight, in front of the entire venire panel. Mr. Wight indicated an inability to be unbiased, because of his friendship with various local police officers. Mr. Wight said that his police friends were frustrated because they worked hard "to no avail," since they often arrested people whom judges and juries subsequently failed to convict. He was also concerned he might "hear something from [my police friends] that would influence me." Although the judge attempted to allay these concerns, Wight remained reluctant to admit he could be unbiased. The judge finally excused him from service, saying "you be sure and tell those guys [Wight's police friends] we try to do our best, but sometimes we have reluctant jurors." After one or two minutes, Maiden's counsel asked to speak to the judge outside the presence of the venire

panel, and moved for a mistrial. He argued, and the prosecution agreed, that the judge's remark could be construed as meaning that the judge wished that juries would convict more often. Both counsel were quick to exclaim that they knew the judge had not in fact meant this, and that their concern was only that the jury might have gotten the wrong impression. Both counsel suggested that the court give an admonishing instruction to clear up any such misimpression. When the venire panel returned the court said, "[a]nd lest there be any misunderstanding about the remark I made to Mr. Wight about jurors being reluctant to serve, it was meant to refer to those jurors who were otherwise qualified, and refused to serve." RT at 379.

Maiden's court-appointed counsel was Roger D. Randall. On the first day of trial, the prosecutor informed the court that Randall had formerly been a prosecutor, and had in fact successfully prosecuted Maiden in a burglary case three years previously. The prosecutor further stated that Randall had told him he had discussed the matter with Maiden, and that Maiden had no objection. The court then secured Maiden's "waiver" on the record.[1]

Maiden was convicted of attempted robbery and first degree murder on August 23, 1974, and sentenced to a prison term of nine years to life. His conviction and sentence were affirmed by the California Court of Appeal in an unpublished opinion on September 23, 1975. Ten years later he began state and federal proceedings for habeas relief. His amended federal petition of April 22, 1992, raised two claims before the district court: ineffective assistance of counsel due to Randall's alleged conflict of interest, and violation of his right to a fair trial resulting from the trial judge's statements to Wight. The district court rejected these claims and denied Maiden's petition.

## II

■ Maiden claims that the district court erred in not holding that he was denied

1. The content of the "waiver" colloquy was limited to the court ascertaining (1) that Maiden knew Randall had "resulted in you being sent to state prison" in the earlier case, and (2) that Maiden nonetheless wanted to have Randall as his attorney.

effective assistance of counsel because his attorney had an impermissible conflict of interest. The denial of a habeas petition is reviewed de novo. *Adams v. Peterson,* 968 F.2d 835, 843 (9th Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993). The de novo standard also applies when reviewing ineffective assistance of counsel claims. *United States v. Swanson,* 943 F.2d 1070, 1072 (9th Cir.1991).

"In order to prevail on an ineffective assistance of counsel claim based on conflict of interest, a defendant must show that 'an actual conflict of interest adversely affected his lawyer's performance.'" *United States v. Miskinis,* 966 F.2d 1263, 1268 (9th Cir.1992) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)); *see Sanders v. Ratelle,* 21 F.3d 1446, 1452 (9th Cir.1994) (same holding in habeas context); *Mannhalt v. Reed,* 847 F.2d 576, 579–80 (9th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988). We have characterized the "actual conflict of interest" and "likely adverse effect" elements as separate prongs of the same test. *Mannhalt,* 847 F.2d at 581. If defendant makes a sufficient showing under both prongs, "prejudice is presumed." *Miskinis,* 966 F.2d at 1268; *Mannhalt,* 847 F.2d at 580.

### A.

■ An "actual conflict of interest" occurs when counsel "actively represented conflicting interests." *Strickland v. Washington,* 466 U.S. 668, 670, 104 S.Ct. 2052, 2056, 80 L.Ed.2d 674 (1984). An actual conflict is generally more difficult to prove, where, as in Maiden's case, counsel represents conflicting interests in successive cases rather than simultaneously. *Mannhalt,* 847 F.2d at 580. In cases of successive representation, "conflicts of interests may arise if the cases are substantially related or if the attorney reveals privileged communications of the for-

mer client or otherwise divides his loyalties." *Id.*

Maiden does not argue that Randall revealed privileged communications or in any other way created a pipeline of confidential information to the prosecution in Maiden's case.[2] Instead, his claim is one of "divided loyalties." *Id.; Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980) (in cases of successive, conflicting representation, court's concern is not only with information leaks, but also with less-than-zealous representation of present client).[3] Maiden argues that we should *presume* that Randall's representation of him was less than zealous because of Randall's prior action in prosecuting Maiden.

To support this argument, Maiden relies on a Seventh Circuit case, *United States v. Ziegenhagen,* 890 F.2d 937 (7th Cir.1989). In contrast to this case, the facts of *Ziegenhagen* present an actual conflict: Ziegenhagen's defense attorney had appeared, twenty years previously, on behalf of the prosecution in an unrelated criminal case involving Ziegenhagen, which ultimately resulted in a conviction. Because that prior conviction was the basis for the government's motion for an enhanced sentence, Ziegenhagen's attorney had to mount a collateral attack on a conviction he himself had previously helped to secure. In finding a Sixth Amendment violation, the court moved beyond the facts of the case before it and held categorically,

> government employment in a prosecutorial role against one defendant and subsequent representation of that defendant in a defense capacity is not proper.

*Id.* at 940.

■ We agree that the prosecutor in *Ziegenhagen* labored under an actual conflict of interest, but hesitate to adopt the broader, *per se* rule announced in that case. Although the possibilities for actual conflicts are very real when attorneys "switch sides" in a sub-

---

2. Indeed, this problem would only arise in the reverse situation: where an attorney had represented a defendant in a prior trial, and had then become a prosecutor and prosecuted defendant in a second trial. Here, in contrast, the only "inside" information possessed by Randall—i.e., his knowledge of the prosecutor's office—would have been, if anything, to Maiden's advantage.

3. In *Trone,* a civil case, the court said that an attorney's professional commitment to zealous representation of her client "is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter." *Id.*

sequent criminal case involving the same defendant, such conflicts do not automatically occur. Determining whether an attorney has an actual conflict involves a closer examination of the facts of each particular case, with a particular eye to whether the attorney will, in the present case, be required to undermine, criticize, or attack his or her own work product from the previous case. Here, unlike in *Ziegenhagen*, the record is devoid of evidence suggesting that the two cases involving Randall and Maiden were "substantially related," *Mannhalt*, 847 F.2d at 580, or that Randall "otherwise divide[d] his loyalties," *id.*, and thus had an actual conflict.[4]

### B. *Alleged Adverse Effects*

■ Even assuming such a conflict existed, Maiden has failed to demonstrate that "some effect on [Randall's] handling of particular aspects of the trial was 'likely.'" *Miskinis*, 966 F.2d at 1268 (citing *Mannhalt*, 847 F.2d at 583); *Sanders*, 21 F.3d at 1452 (reviewing court "must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conduct"). This showing need not rise to the level of actual prejudice, as it must with most ineffective assistance claims. *Miskinis*, 966 F.2d at 1268. Nonetheless, it remains a substantial hurdle, and one which Maiden fails to clear.[5]

Maiden first alleges that his attorney spoke to him in a "condescending and sarcastic manner" in front of the jury. The two instances he alleges, which are the only two to be found in the entire transcript, involve the following questions during Randall's direct examination of Maiden:

> For those of us who aren't *connoisseurs*, what is Silver Satin?

> Did you continue to *fraternize* with Mr. Matthew?

Even in isolation, these questions do not portray Maiden in a condescending or sarcastic light. When read in context, they evidence Randall's attempt to establish a rapport with Maiden in front of the jury. As the district court correctly found, the record discloses that Randall questioned Maiden in a careful, courteous, and matter-of-fact manner.

Second, Maiden contends that counsel not burdened with a conflict of interest "would have objected to [the] highly prejudicial testimony" given by various witnesses concerning the alleged murder weapon, a gun. Appellant's Opening Brief at 11. These witnesses, to the extent their testimony was consistent, claimed that the gun in question was purchased from a member of the "Crypt" gang. They were not themselves members of that gang. They were all Maiden's friends, although only one, Frazier, gave any reason to suspect that Maiden himself ever possessed the gun. Maiden argues that this was all an "obvious attempt to associate the appellant with a gang and prejudice him in front of the jury," and that Randall, therefore, would have objected to it, but for his "divided loyalties." *Id.*

On the contrary, Randall specifically argued that all testimony relating to the gun was irrelevant, and the court clearly held

---

4. We by no means endorse the practice of switching sides in criminal cases; we merely hold that it does not necessarily create a conflict of interest for constitutional purposes, and that it did not in fact do so here. The practice may well raise serious ethical problems for practitioners. *See Annotated Model Rules of Professional Conduct*, Rule 1.7, cmt. (1992) ("Loyalty is an essential element in the lawyer's relationship to a client"); Hall, *Professional Responsibility of the Criminal Lawyer* 401 (1987) ("ethic[s] rules prohibit any conflicts which could diminish or dilute a lawyer's loyalty and zeal in representing a client").

5. California also argues that Maiden waived his Sixth Amendment rights when he said in open court that he knew Randall had previously prose-

cuted him, but that he still chose to continue with Randall as his attorney. However, the trial court did not ascertain whether Maiden knew a possible conflict existed and might affect his case, or whether he knew he had the right, in such a situation, to have a different attorney appointed. Courts have a "serious and weighty responsibility" to ascertain with certainty that a defendant has waived a constitutional right. *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *United States v. Christensen*, 18 F.3d 822, 826 (9th Cir.1994). Neither Maiden's brief colloquy with the court, nor the subsequent "silence and inaction" of his attorney, as the district court put it, demonstrate a knowing and voluntary waiver.

that Randall's objections went only to the weight, not the admissibility, of the evidence. Moreover, none of the witnesses testified, and the prosecution did not ask, about any contact which might have occurred between Maiden and the alleged "Crypt." Rather, they testified about a gun which was similar to the one used in the murder, and their testimony placed the gun in the vicinity of Maiden at about the right time. The "Crypt" entered the picture only to the extent that the prosecution was trying to establish the entire chain of possession through which the gun passed during the time in question.

In sum, Maiden has not met his burden of pointing to some aspect of Randall's trial performance which was a likely adverse effect stemming from the alleged conflict of interest. We find this case significantly different from all of the cases in which we have granted relief based on a conflict of interest. *See, e.g., Sanders,* 21 F.3d at 1453–55 (defense attorney switched representation from one to another codefendant, and then counselled former client to assert Fifth Amendment right not to testify during current client's trial, to the likely detriment of current client's case); *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1251–53 (9th Cir.1988) (adverse effect found where attorney failed to present evidence which would exculpate present client at expense of former client, a codefendant); *Mannhalt,* 847 F.2d at 583 (four kinds of adverse effect found likely, including counsel's failure to seek a plea bargain which might implicate counsel in criminal activity, and his "unseemly and emotional" cross-examination of witness who had accused him of criminal activity).

### III

Maiden also claims that the trial judge's comment to potential juror Wight deprived him of his Sixth Amendment right to a fair trial. He argues that this comment gave the jurors the impression that the judge approved of jurors who voted to convict and, therefore undermined the presumption of in-

nocence. *See Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976); *Norris v. Risley,* 918 F.2d 828, 830–31 (9th Cir.1990); *United States v. Eldred,* 588 F.2d 746, 749 (9th Cir.1978) (per curiam) ("[a] trial judge must ... avoid even the appearance of advocacy or partisanship"). We review the district court's rejection of this argument de novo, and consider whether the judge's statement, even after his curative admonition, was "so inherently prejudicial as to pose an unacceptable threat" to a fair trial. *Norris,* 918 F.2d at 830 (quoting *Holbrook v. Flynn,* 475 U.S. 560, 572, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986)). Put another way, Maiden must show that "an unacceptable risk is presented of impermissible factors coming into play." *Id.* (quoting *Estelle v. Williams,* 425 U.S. at 505, 96 S.Ct. at 1693).

■ The judge's remark was a sarcastic barb,[6] directed at Wight, who the judge thought was qualified to serve, but for his self-proclaimed bias. It was no doubt a criticism of jurors "reluctant to *serve,* not, once empaneled, to *convict."* ER 18 (district court's characterization of remark). Given the context, however, the remark could certainly have been construed by the venire panel to be an expression of judicial frustration that juries did not convict more often, and as an indication that the judge was fundamentally "on the same side" as the police friends of the excused juror. Indeed, the prosecutor himself admitted that the judge's statement could be interpreted in this manner.

Whatever the judge meant by his remark, the jury could have taken from it an impression of "advocacy or partisanship." *See Eldred,* 588 F.2d at 749. We must therefore consider whether that impression would have made the trial inherently unfair, or whether the judge's subsequent admonition sufficiently obviated the risk of such an impression of prejudice infecting the trial. *See United States v. Sanchez–Lopez,* 879 F.2d 541, 555 (9th Cir.1989).

Cases finding fatally prejudicial judicial bias have uniformly involved much more

---

**6.** Neither Maiden's counsel nor the prosecutor suggested that the judge was *actually* biased, or that his remark indicated an actual desire to see

more convictions, and Maiden does not now advance any such contention.

shocking factual situations than the remark we consider here. *E.g., United States v. Allsup,* 566 F.2d 68 (9th Cir.1977) (judge gave jury the impression that defendant had threatened a witness); *United States v. Pena–Garcia,* 505 F.2d 964 (9th Cir.1974) (judge gave jury the impression he thought defendant was lying under oath); *United States v. Stephens,* 486 F.2d 915 (9th Cir. 1973) (judge gave jury the impression he thought evidence suggested defendant's guilt). Nonetheless, we think it doubtful that a jury could still do its job fairly and impartially if the jurors were under the impression that the judge might disapprove of an acquittal.

Here, however, the judge's explanation that he was frustrated with jurors who wouldn't *serve,* not with those who wouldn't *convict,* sufficiently dispelled any misimpression of judicial bias. The judge's remarks to Wight took place during a long day of voir dire, and were addressed only to Wight. The judge almost immediately gave a curative admonition, which decisively disavowed any displeasure with jurors who do not convict. Finally, Maiden does not allege or present evidence concerning any other instances, before or during the trial, in which the judge gave the jury any impression of bias. The judge's subsequent impartial conduct itself acted as a powerful remedy to any improper impression the jury might have formed during voir dire.

The judge's curative admonition and subsequent impartial conduct were sufficient to prevent the jury from forming an "abiding impression" of "advocacy or partiality." *United States v. Laurins,* 857 F.2d 529, 537 (9th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989).[7]

AFFIRMED.

---

**7.** Other circuits, when reviewing an isolated judicial comment which could possibly be construed as indicating bias, have come to similar conclusions. *See, e.g., United States v. Santos,* 932 F.2d 244, 254 (3rd Cir.1991) (referring to female defendant's duress defense, judge said "[having] an abusive husband is no license to break the law," but later gave corrective instruction, and did not otherwise appear biased); *Harris v. Lockhart,* 743 F.2d 619, 620 (8th Cir.1984) (after thirteen year-old prosecution witness testified, judge told her "you did a good job, Susan. You may step down," possibly giving jury impression of vouching for her testimony; appeals court found no effect on overall fairness of trial).