UNITED STATES of America,
Plaintiff–Respondent,

v.

John M. RACICH, Defendant–Petitioner.

CIV. No. 97–0768–R
CRIM. No. 92–1485–R.

United States District Court,
S.D. California.

Jan. 25, 1999.

---

**1208**

Alan D. Bersin, United States Attorney, Laura J. Birkmeyer, Assistant U.S. Attorney, San Diego, CA, for Plaintiff–Respondent.

John M. Racich, Seagoville, TX, pro se.

## AMENDED ORDER DENYING PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

RHOADES, Senior District Judge.

### I. Overview

Petitioner John M. Racich has filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. For the reasons stated below, the Court denied the motion in an order dated August 26, 1998. The Court now amends the original order, nunc pro tunc, in order to correct several citation errors.[1]

### II. Background

#### A. Factual Background

The facts of this case began in Mexico. On the night of November 3, 1992, a Mexican police officer named Javier Ojeda stopped Petitioner. The officer observed that Petitioner was wearing an empty holster. The officer searched Petitioner's truck and found a Glock 10 millimeter pistol underneath the seat.

Petitioner's troubles increased when two other Mexican police officers arrived, one of whom toted a submachine gun. At some point, the subject of a *mordida* (bribe) arose, and Petitioner gave the officers $1480 to secure his release. The officers released Petitioner, but refused to return his gun until Petitioner went to the United States, got more money, and gave the money to the officers.

At approximately 6:50 a.m. on November 4, 1992, Petitioner returned to the United States through the San Ysidro port of entry. Petitioner told a customs inspector that he

---

1. This amended order corrects errors which were originally located in citations to the following cases: *United States v. Washington*, 109 F.3d 459 (8th Cir.1997); *United States v. Baramdyka*, 95 F.3d 840 (9th Cir.1996), *cert. denied*, 520 U.S. 1132, 117 S.Ct. 1282, 137 L.Ed.2d 357 (1997); *United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985); *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

had just been "ripped off." Petitioner asked twice if he could use the inspector's gun to shoot the Mexican police officers. The inspector refused, but admitted Petitioner into the United States.

Petitioner then hatched an elaborate plan: He went to a 7–11 store in Chula Vista, California and withdrew money from an automatic teller machine. He then bought Gatorade, a large cup of coffee, and a cigarette lighter. He emptied the Gatorade bottle and coffee cup.

Petitioner took further steps. He went to a gas station across the street and filled the coffee cup, the Gatorade bottle, and a beer bottle with gasoline. Using a paper towel and a sock, he fashioned wicks for the two bottles. Petitioner's labors yielded incendiary bombs, more commonly known as molotov cocktails.

Petitioner's plan required his return to Mexico, where he met Officer Ojeda and another officer. Petitioner approached the police car as the officers sat in the car. As he approached, he pretended to drink from the gasoline-filled coffee cup. He then paid $300 to one of the officers, who returned Petitioner's gun.

At this point, Petitioner could have returned to the United States with his gun and put this entire episode behind him. Alas, Petitioner did not choose that path. Instead, he doused the two officers with gasoline and set them afire with the cigarette lighter.

Pandemonium ensued. Petitioner jumped into his truck and sped toward the border. Mexican officers pursued him, firing shots as he fled. Bullets hit inspection booths on the American side of the border.

In the end, Petitioner could run but he could not hide: He abandoned his truck in heavy traffic and was arrested, lighter in hand, after running past the inspection area into the United States.[2]

### B. Procedural History

On November 10, 1992, a federal grand jury indicted Petitioner for (1) unlawful exportation of defense articles, in violation of 22 U.S.C. § 2778; (2) unlawful manufacture of a

firearm, in violation of 26 U.S.C. §§ 5822, 5861(f), and 5871; and (3) illegal importation of a firearm, in violation of 18 U.S.C. § 922($l$). The Republic of Mexico wanted to charge Petitioner with other crimes, and sought extradition.

The Court appointed attorney Gary Edwards to represent Petitioner. Petitioner and the government then entered into plea negotiations, which resulted in Petitioner tentatively accepting a plea offer. On August 2, 1993, during the resulting plea hearing, Petitioner said that he felt "woozy" due to medication he had taken. The Court discontinued the plea hearing.

To ascertain Petitioner's ability to enter a plea, and to schedule another plea hearing, the Court held a chambers conference two days later. Petitioner's attorney attended the conference, but Petitioner himself did not attend.

On August 26, 1993, Petitioner requested a change in counsel. The Court appointed Jerry Leahy as Petitioner's new attorney.

Petitioner rejected the government's initial plea offer, but with the assistance of his new attorney, he accepted a different offer several months later. On November 22, 1993, Petitioner pleaded guilty to count two (unlawful manufacture of a firearm), and the government withdrew the remaining counts. In the plea agreement, Petitioner expressly "waive[d] his right to appeal and his right to collaterally attack any proceedings in [the] case prior to the sentencing hearing." (Plea Agreement at 5.)

After a series of continuances, the Court scheduled the sentencing hearing for June 7, 1994. Less than a week before, Petitioner filed a motion to withdraw his plea. The Court denied the motion.

Under the United States Sentencing Guidelines, Petitioner faced 262 to 327 months in prison, but the statutory maximum was 120 months. The Court sentenced Petitioner to 120 months and three years of supervised release.

---

**2.** Petitioner's monstrous act had drastic consequences. Officer Ojeda received severe, debilitating, and horribly disfiguring injuries. He suffered deep burns on thirty-six percent of his body, including his face, neck, and chest.

Petitioner appealed his sentence to the United States Court of Appeals for the Ninth Circuit. Petitioner also appealed the denial of his motion to withdraw his plea. The Ninth Circuit affirmed in both respects. *See United States v. Racich,* 53 F.3d 341, 1995 WL 257873 (9th Cir.1995) (Reinhardt, Fernandez, and McKay, JJ.)

### III. Discussion

On April 21, 1997, Petitioner filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, asking the Court to vacate his guilty plea. Petitioner argues that the Court should vacate his plea for four reasons. First, he argues that the Court violated Federal Rule of Criminal Procedure 11 in various ways. Second, he argues that he pleaded involuntarily because he had been denied medication, and therefore could not think clearly. Third, he argues that his attorney, Jerry Leahy, provided ineffective assistance in numerous respects. Fourth, Petitioner argues that the government breached the plea agreement.

The Court will address each of these arguments in turn.

### A. Petitioner's Rule 11 Claims

The government attacks Petitioner's Rule 11 claims on three grounds. First, the government argues that Petitioner cannot raise Rule 11 claims because he expressly waived his right to attack the judgment collaterally. Second, the government argues that Petitioner cannot raise the issues now because he failed to raise them at an earlier proceeding. Third, the government argues that Petitioner's Rule 11 arguments fail on the merits.

#### 1. Whether Petitioner's Waiver Bars His Rule 11 Claims

The government first argues that the Court should not entertain Petitioner's Rule 11 claims because he expressly waived his right to attack the judgment collaterally.

■ The right to attack a judgment collaterally is statutory. *See United States v. Abarca,* 985 F.2d 1012, 1014 (9th Cir.1993). A knowing and voluntary waiver of a statutory right is enforceable. *See id.; United States v. Navarro–Botello,* 912 F.2d 318, 321 (9th Cir.1990). For this reason, a prisoner may not collaterally attack a judgment if the prisoner waived the right to do so. *See United States v. Pruitt,* 32 F.3d 431, 433 (9th Cir.1994).

Despite these principles, a waiver does not bar certain types of claims. *See generally United States v. Baramdyka,* 95 F.3d 840, 843 (9th Cir.1996) (discussing various exceptions to the rule that waivers are enforceable), *cert. denied,* 520 U.S. 1132, 117 S.Ct. 1282, 137 L.Ed.2d 357 (1997). The Court must decide whether a waiver can bar Rule 11 claims. This appears to be an issue of first impression. The Court concludes that a waiver cannot bar Rule 11 claims.

■ It is well settled that a waiver does not bar claims that relate to the validity of the waiver itself. *See Abarca,* 985 F.2d at 1014. A claim relates to the validity of the waiver if the claim relates to whether the defendant voluntarily entered into the agreement that contains the waiver. *See United States v. Wenger,* 58 F.3d 280, 282 (7th Cir. 1995) (stating that "[w]aivers . . . must stand or fall with the agreements of which they are a part").

■ Rule 11 claims relate to concerns of voluntariness, and therefore relate to the validity of the waiver, because Rule 11 seeks "to ensure that a plea is made knowingly and voluntarily." *United States v. Randel,* 8 F.3d 1526, 1528 (10th Cir.1993); *see also United States v. Hekimain,* 975 F.2d 1098, 1100 (5th Cir.1992) (stating that two of the "core concerns" of Rule 11 are whether the guilty plea was coerced and whether the defendant understands the consequences of the plea). Rule 11 is the only judicial device focused on determining the voluntariness of guilty pleas. Thus, in § 2255 proceedings, if a court is to determine the voluntariness of a guilty plea, the court must determine whether Rule 11's dictates were followed. Therefore, because it is well-settled that prisoners may raise claims that implicate the validity of the waiver itself, it follows that prisoners may raise Rule 11 claims as well. *Cf. Wenger,* 58 F.3d at 282 (stating that "[i]f the agreement is voluntary *and* taken in compliance with Rule 11, then the waiver . . . must be honored") (emphasis added); *Navarro–Botello,* 912 F.2d at 320–21 (finding that the

defendant knowingly and voluntarily entered the plea agreement, yet still proceeding to determine whether the district court complied with Rule 11).

In addition, besides seeking to ensure the voluntariness of guilty pleas, Rule 11 has two other purposes. First, it protects the integrity of the courts. *See United States v. Bruce,* 976 F.2d 552, 554–58 (9th Cir.1992).[3] If a defendant could waive Rule 11 protections, the defendant would also be waiving a protection intended for the courts. This is clearly an impermissible result.

Second, Rule 11 seeks to ensure judicial impartiality after plea negotiations are completed. *See id.* If a defendant could waive Rule 11 claims, he could undermine the court's role in determining the fairness of a plea agreement after negotiations are completed. The court's role would be meaningless if it were merely asked to rubber-stamp an agreement in which it participated.

For all the foregoing reasons, the Court holds that a plea agreement's waiver provision does not bar Rule 11 claims.

## 2. Whether Petitioner Procedurally Defaulted On His Rule 11 Claims

The Court must now consider the government's second attack on Petitioner's Rule 11 claims. The government argues that because Petitioner did not raise his arguments in an earlier proceeding, he cannot raise them now. In other words, the government argues that Petitioner procedurally defaulted on his Rule 11 arguments.

"[A] § 2255 petitioner [generally] cannot challenge nonconstitutional . . . errors if such errors were not challenged in an earlier proceeding." *United States v. McMullen,* 98 F.3d 1155, 1157 (9th Cir.1996), *cert. denied,* 520 U.S. 1269, 117 S.Ct. 2444, 138 L.Ed.2d 203 (1997).[4] Nevertheless, a prisoner may raise new issues if the prisoner shows good cause for not raising them earlier and prejudice from that failure. *See id.* at 1157. "Establishing the elements of an inef-

fective assistance of counsel claim normally will meet this cause and prejudice test." *Id.* (citing *United States v. De la Fuente,* 8 F.3d 1333, 1337 (9th Cir.1993)). To establish an ineffective-assistance claim, Petitioner must establish (1) that "counsel's representation fell below an objective standard of reasonableness;" and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Petitioner argues that his attorney was ineffective for failing to raise the Rule 11 arguments on appeal. Petitioner has advanced no other reason for his failure to raise these issues earlier. Therefore, the question of whether Petitioner has procedurally defaulted on his Rule 11 claims turns on whether his attorney was ineffective for not raising the Rule 11 claims on appeal.

For two reasons, the Court finds that Petitioner's attorney did not act unreasonably by not raising the Rule 11 issues on appeal. First, the Court addresses the merits of the Rule 11 arguments below, and finds that they have no merit. Petitioner's attorney did not act unreasonably by not raising meritless arguments.

Second, even assuming that Petitioner's Rule 11 claims had merit, his attorney did not act unreasonably by not raising them on appeal because the plea agreement's waiver provision ostensibly barred him from doing so. The waiver in Petitioner's plea agreement is as express as they come. Petitioner agreed to "waive his right to appeal . . . any proceedings in [the] case prior to the sentencing hearing." (Plea Agreement at 5.) All of Petitioner's Rule 11 arguments relate to incidents prior to the sentencing hearing. Thus, the waiver seems to prohibit Petitioner from raising his Rule 11 claims.

Until today, no Court has ever held that a waiver does not bar Rule 11 claims. In light

---

3. Among other things, Rule 11 forbids judicial entanglement in plea negotiations. *See* Fed. R.Crim.P. 11(e)(1).

4. Although Rule 11 aims to protect constitutional rights, the procedural safeguards of Rule 11 are

not themselves constitutional requirements. *See Bruce,* 976 F.2d at 559 (citing *McCarthy v. United States,* 394 U.S. 459, 465, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)).

of this dearth of authority and the express, clear waiver, Petitioner's attorney reasonably could have believed that the waiver precluded him from raising Rule 11 arguments. Hence, counsel did not act unreasonably by not raising Petitioner's Rule 11 claims on appeal.

Because Petitioner has failed to establish that his attorney acted unreasonably, he has failed to establish his ineffective-assistance claim. He therefore has failed to establish the requisite "cause" and "prejudice" that would excuse his procedural default. Accordingly, the Court finds that Petitioner has procedurally defaulted on his Rule 11 arguments. The Court denies them on this basis.

### 3. Whether Petitioner's Rule 11 Claims Succeed On the Merits

Even if Petitioner had not procedurally defaulted, his arguments would fail on the merits. Petitioner raises two Rule 11 claims. He argues that the Court (1) impermissibly participated in plea negotiations; and (2) failed to state the maximum penalties Petitioner faced. The Court will address each argument in turn.

### a. Judicial Participation In Plea Negotiations

 Federal Rule of Criminal Procedure 11(e)(1) governs plea negotiations and provides that "[t]he court shall not participate in any such discussions." Rule 11(e)(1) creates a "bright-line rule" forbidding "all forms of judicial participation" before parties have reached a final agreement. *Bruce*, 976 F.2d at 556 (quoting *United States v. Adams*, 634 F.2d 830, 835 (5th Cir.1981)). Rule 11(e)(1) "applies to ... judicial participation in plea negotiations between counsel, as well as to discussions held in the defendant's presence." *United States v. Washington*, 109 F.3d 459, 463 (8th Cir.1997).

Petitioner argues that the Court should vacate his guilty plea because the Court crossed Rule 11(e)(1)'s "bright line" during the chambers conference. To address Petitioner's argument, the Court must determine (1) whether it violated Rule 11(e)(1); and (2) whether any violation that may have occurred was harmless.

### i. Whether The Court Violated Rule 11(e)(1)

During the chambers conference, the Court and the parties discussed when to hold a plea hearing, and when to start trial if plea negotiations failed. The Court had difficulty scheduling the trial because of other matters. The following dialogue took place:

| | |
|---|---|
| THE COURT: | ... I can do the plea at any time.... I am not going to force him to do anything.... He should make up his own mind [about] what he wants to do.... |
| MR. EDWARDS: | ... Are you going to revoke the offer? |
| MS. BIRKMEYER 5: | We will give him a week or two .... |
| THE COURT: | At some point in time ... he is going to have to decide, yes or no. And if it is yes, he wants to plead, then we will take the plea; no, we will—and I think the government, they can't wait forever. They also have this extradition possibility. I think it is part of [Petitioner's] problem. |
| MR. EDWARDS: | Oh, definitely. |
| THE COURT: | He has to think about that. |
| MR. EDWARDS: | He is thinking about that all the time. He is terrified, absolutely terrified of that. |
| THE COURT: | Because whatever happens here will be possibly light weight as to what could happen down there. |

(Chambers Conference Tr. at 8–9.)

Shortly after this dialogue, the following exchange took place:

| | |
|---|---|
| THE COURT: | ... I think you two ought to talk between today and tomorrow, for you to extend it as far as you feel you can. |
| MS. BIRKMEYER: | Yes, your honor. |
| THE COURT: | The offer, that is. |

(*Id.* at 12.)

The Court doubts that it crossed Rule 11(e)(1)'s "bright line" during the above dialogues. The Court merely was trying to manage its docket and schedule Petitioner's trial. The Court did not discuss the terms and conditions of a plea offer, nor did the Court suggest that it wanted Petitioner to plead guilty. In fact, the Court specifically stated that Petitioner should decide for himself whether to plead guilty.

Nevertheless, the Court concedes that its comments could be construed as getting involved in plea negotiations. The Court's

---

5. Laura Birkmeyer is the Assistant United States Attorney assigned to the case.

comments could be interpreted as urging Petitioner to decide quickly. Moreover, the Court asked the government to leave its offer open as long as possible, which may have engaged the Court in setting the timing for the revocation of the plea offer. The Court also implied that Petitioner would fare better by pleading guilty than by refusing to plead guilty and being extradited to Mexico. Although the Court merely wanted to inform and assist Petitioner, its comments may have crossed Rule 11(e)(1)'s "bright line." *See Bruce,* 976 F.2d at 558 (finding a violation of Rule 11(e)(1) even though the district court's comments were "both compassionate and well-motivated"). The Court now must consider whether the possible error was harmless.

ii. Whether Any Violation Of Rule 11(e)(1) That May Have Occurred Was Harmless

■ Rule 11(h) provides that "[a]ny variance from the procedures required by this rule which does not affect substantive rights shall be disregarded." Subsection (h) makes clear that guilty pleas "should not be overturned ... when there has been a minor and technical violation of Rule 11 which amounts to harmless error." Fed.R.Crim.P. 11 advisory committee's notes.

The Court has found no case holding an instance of judicial entanglement in plea negotiations harmless. In fact, several courts have expressed doubt as to whether a Rule 11(e)(1) violation can *ever* be harmless. *See, e.g., United States v. Miles,* 10 F.3d 1135, 1139–41 (5th Cir.1993). Nevertheless, the Court cannot hold that Rule 11(h) does not apply to violations of Rule 11(e)(1).

Rule 11(h) applies to "*any*" violation of Rule 11. "'Any' is an all-encompassing

term." *Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d 1390, 1394 (9th Cir.1991). Thus, the clear, unambiguous language of the rule dictates that Rule 11(h) applies to violations of Rule 11(e)(1). *See Continental Cablevision, Inc. v. Poll,* 124 F.3d 1044, 1049 (9th Cir.1997) (holding that clear statutory "language must ordinarily be regarded as conclusive").

Moreover, Courts must give meaning to each provision of a statute, rather than interpreting one section in a way that renders another section meaningless. *See Freytag v. Commissioner,* 501 U.S. 868, 877, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (citing *Pennsylvania Dept. of Pub. Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)); *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy,* 898 F.2d 1410, 1416, n. 15 (9th Cir. 1990) (citing *Adams v. Howerton,* 673 F.2d 1036, 1040 (9th Cir.1982)). Indeed, "[a] statute should be construed so as to avoid making *any word* [meaningless]." *United States v. Handy,* 761 F.2d 1279, 1280 (9th Cir.1985) (emphasis added). If the Court held that Rule 11(h) does not apply to violations of Rule 11(e)(1), then the Court would render the word "any" meaningless. Accordingly, the Court holds that Rule 11(h) applies to violations of Rule 11(e)(1).[6]

■ In the instant case, three factors indicate that any violation of Rule 11(e)(1) amounted only to harmless error. First, the violation at issue concerned a plea agreement that Petitioner subsequently *rejected.* If the violation had related to an accepted plea offer, the concerns would be greater. *Cf. Bruce,* 976 F.2d at 556 n. 3 (stating that "if the judge ... recommend[s] the acceptance

---

**6.** In *United States v. Bruce,* 976 F.2d 552 (9th Cir.1992), the Ninth Circuit held that "a defendant who has pled guilty after the judge has participated in plea discussions should be allowed to replead, without having to show that actual prejudice has resulted from the participation." *Id.* at 558 (internal quotation marks and citations omitted). *Bruce* did not, however, hold that the defendant need not make *any* showing, such as a reasonable likelihood of prejudice. *Cf. Sanders v. Ratelle,* 21 F.3d 1446, 1452 (9th Cir.1994) (holding that if the defendant's attorney had a conflict of interest, the defendant need not show actual prejudice, but still must show

that "some effect on counsel's handling of particular aspects of the [case] was likely"). Moreover, *Bruce* is distinguishable because it arose on direct review. "By contrast, where the district court's compliance with Rule 11 is challenged in the context of ... § 2255, ... a ... violation of the rule will not support ... collateral relief in the absence of a showing of constitutional error or special prejudice." *United States v. Jaramillo–Suarez,* 857 F.2d, 1368, 1370 n. 2 (9th Cir. 1988) (citing *United States v. Timmreck,* 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979)); *see also Arias v. United States,* 484 F.2d 577, 579 (7th Cir.1973) (same).

of a particular agreement, the degree of coercion inherent in judicial participation in plea discussions is ... heightened"). However, Petitioner ultimately accepted a *different* offer *several months later.*

Second, Petitioner did not attend the chambers conference, and he discharged his attorney shortly afterwards. The record does not indicate that counsel conveyed the contents of the discussion to Petitioner or subsequent counsel. In fact, the record strongly indicates that counsel did not relay the conversation to Petitioner. This brings us to the third major consideration.

Third, Petitioner's own words demonstrate that he never learned of the contents of the conversation during the period in which he contemplated accepting the government's revised plea offer. In his motion, Petitioner stated that the Court said that the plea agreement did not "shock the conscience" and that an "upward departure [for bodily harm] seem[ed] appropriate." The Court said no such thing.[7]

Petitioner did not provide an accurate account of the conversation until October 8, 1997, when he filed a supplemental brief—after the government had given him a copy of the transcript of the chambers conference. Clearly then, Petitioner never knew what the Court said during the chambers conference.

For these reasons, it is abundantly clear that the Court's statements had no effect on Petitioner's decision to accept the second plea offer. Petitioner should not benefit from this completely harmless error.

b. Whether The Court Failed To State The Maximum Penalty

■ For his second Rule 11 claim, Petitioner argues that the Court failed to inform him of the maximum sentence he faced. Specifically, Petitioner claims that the Court did not inform him that if he violated the terms of his supervised release, he could be sent back to prison even after he had served

the statutory maximum sentence. As a corollary to this Rule 11 argument, Petitioner claims that he pleaded involuntarily because he did not understand the full ramifications of pleading guilty.[8]

Rule 11 requires a district court to inform a defendant of, and determine that he understands, "the maximum possible penalty provided by law, including the effect of any ... supervised release term." Fed.R.Crim.P. 11(c)(1). To determine whether the Court complied with this rule, the Court looks only to the plea hearing transcript. *See United States v. Kamer,* 781 F.2d 1380, 1383 (9th Cir.1986) (holding that "claims of noncompliance with rule 11 must be resolved solely on the basis of the rule 11 transcript"). Likewise, to determine whether Petitioner understood the penalties he faced at the time he entered his plea, the Court looks only to the transcript. *See United States v. Graibe,* 946 F.2d 1428, 1434 (9th Cir.1991) (holding that "in determining what the defendant knew [at the time of the plea], [courts] are limited to what the record of the plea proceeding contains").

A review of the record reveals that the Court complied with Rule 11(c)(1), and that Petitioner understood the penalties he faced. Specifically, the following dialogue took place at the plea hearing:

THE COURT: What is the maximum penalty?

MS. BIRKMEYER: Your honor, the maximum penalty is ten years imprisonment and a $250,000 fine, three years supervised release and a $50 penalty assessment.

THE COURT: Is that your understanding, Mr. Racich?

DEFENDANT: Yes, your honor.

(Plea Hr'g Tr. at 10.)

Moments later, the following exchange took place:

THE COURT: Do you understand ... that supervised release is possible; that during the period of supervised release, I may impose certain conditions; and if you violate those conditions, you may

---

7. Somehow, Petitioner seems to have confused the present case with *United States v. Torres,* 999 F.2d 376 (9th Cir.1993) (per curiam), which he cites. In *Torres,* the Ninth Circuit held that this Court did not entangle itself in plea negotiations, even though this Court said that a proposed plea agreement did not "shock [the] conscience." *Id.* at 378.

8. Obviously, Petitioner's argument contains two distinct, yet related, components: The claim that the Court failed to ensure that he pleaded voluntarily by informing him of all the possible consequences, and the claim that he actually pleaded involuntarily. Because the issues so heavily relate to each other, the Court will discuss them together.

be brought back before the Court and receive further punishment in this case and possible new charges; and the maximum penalty is a statutory maximum? Do you understand that, Mr. Racich?

DEFENDANT: Yes, your honor.

(Plea Hr'g Tr. at 12.)

Despite this plain colloquy, Petitioner argues that the Court should have stated explicitly that if he served his ten year sentence, and then violated his supervised release, he could be imprisoned again, which would result in an aggregate term of imprisonment in excess of the statutory maximum. Petitioner has cited no authority that requires the Court to state such a patently obvious fact, and the Court's independent research has revealed none.[9] Indeed, the contrary is true: The Ninth Circuit has held that "many aspects of traditional parole need not be communicated to the defendant ... under the umbrella of Rule 11. For example, a defendant need not be advised of all conceivable consequences such as ... that, if he violates his parole, he will again be imprisoned." *Bunker v. Wise*, 550 F.2d 1155, 1158 (9th Cir.1977). This reasoning applies equally to violations of supervised release. Thus, the Court did not fail to describe the maximum penalties.

Moreover, Petitioner clearly understood the penalties. It strains credibility to assert that Petitioner somehow believed that no matter how often or flagrantly he violated his supervised release, he would be immune from further imprisonment. The Court specifically told him that he could "receive further punishment in this case." (Plea Hr'g Tr. at 12.)

The record is clear: The Court advised Petitioner of the maximum penalties he faced, and Petitioner understood the penalties. Petitioner's claim fails.

**B. Whether Petitioner Pleaded Involuntarily Due To A Denial Of Medication**

Petitioner next argues that he pleaded involuntarily due to the denial of antidepressant medication. Petitioner claims that his "thinking was slow and unclear" and that he "would not have signed the plea agreement under stress and would have insisted upon proceeding to trial." (Pet'r's Supp. Br. at 5.) [10]

The transcript of the plea hearing belies Petitioner's argument. First, Petitioner seemed alert and participated in the dialogue by answering the proffered questions. When asked if he had any questions regarding the plea agreement, Petitioner stopped the proceedings and asked his lawyer a question. Upon receiving what was apparently a satisfactory answer, Petitioner stated that he had no questions regarding the plea agreement. These are not the actions of a person who could not comprehend the proceedings.

Second, Petitioner did not merely provide rote answers to the Court's questions. At one point, the Court asked if anyone had forced Petitioner to plead guilty. Petitioner responded: "Probably it would be better if I didn't answer that." (Plea Hr'g Tr. at 13.) The Court continued the questioning, and after a protracted exchange, Petitioner stated that no one had forced him to plead guilty. (*See id.* at 13.) This also shows that Petitioner was alert and participating in the dialogue. Petitioner was apparently considering the Court's questions carefully.

Third, and most important, Petitioner satisfactorily answered the Court's questions regarding his mental state. Petitioner stated that he recently had taken only Motrin and

---

9. Petitioner relies on *United States v. Sanclemente–Bejarano*, 861 F.2d 206 (9th Cir.1988) (en banc) and *United States v. Hekimain*, 975 F.2d 1098 (5th Cir.1992). These cases do not help Petitioner. *Sanclemente–Bejarano* involved a district court completely failing to apprise the defendant of the possibility of supervised release. *See Sanclemente–Bejarano*, 861 F.2d at 208. Similarly, *Hekimain* involved a district court inaccurately describing the consequences of supervised release. *See Hekimain*, 975 F.2d at 1100–03. By contrast, here the Court advised Petitioner of the existence of supervised release and that a violation could result in further punishment.

10. Like Petitioner's Rule 11 arguments, this claim implicates the validity of the plea itself. Thus, the Court can consider the argument despite the plea agreement's waiver provision. Also, Petitioner's argument presents constitutional concerns that the Court will consider even though Petitioner did not raise the argument earlier. *See Schlesinger*, 49 F.3d at 485.

stomach medication. (*See id.* at 5.) He further stated that nothing was impairing his ability to think or reason, and that he understood the proceedings. (*See id.*) Furthermore, Petitioner's attorney stated that he believed Petitioner was competent to enter the plea. The record reflects that Petitioner was asked several questions regarding his medication and mental state, and in all instances he indicated that he understood the proceedings. (*See id.*)

As Petitioner's own statements during the plea hearing reveal, Petitioner comprehended the questions asked of him, understood the proceedings, and was competent to plead guilty. Petitioner should not now be heard to challenge his affirmations. *See Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (stating that "[s]olemn declarations in open court carry a strong presumption of verity"). Petitioner's argument fails.

### C. Petitioner's Ineffective–Assistance Claims

Petitioner next raises numerous claims of ineffective assistance. Petitioner argues that his attorney (1) failed to investigate the relevant facts and law, and thereby rendered bad advice; (2) failed timely to file a motion to withdraw Petitioner's guilty plea; (3) had a conflict of interest that prevented him from vigorously representing Petitioner; and (4) failed to raise numerous issues on appeal. The Court will consider each of these claims under the two-step *Strickland* analysis discussed above, bearing in mind the strong presumption that defense counsel performed within the wide "range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

### 1. Whether Petitioner's Attorney Failed To Investigate The Case

Petitioner first argues that his attorney, Jerry Leahy, failed to investigate the relevant facts and law. Specifically, Petitioner claims that his attorney should have discovered that counts one and three did not apply to Petitioner's conduct. Petitioner argues

that if Mr. Leahy had discovered this fact and brought it to the Court's attention, the Court would have dismissed counts one and three. Petitioner argues that if he had known that counts one and three were invalid, he would not have pleaded guilty to count two in exchange for the government's withdrawal of the other counts.

The Court will discuss counts one and three separately.

#### a. Count One

 Count one charged Petitioner with exporting defense articles without a license, in violation of 22 U.S.C. § 2778. Petitioner argues that count one did not apply because a violation of § 2278 requires that a defendant engage "in the *business* of knowing and willfully exporting firearms." (Mot. at 14 (emphasis added)). Petitioner argues that he clearly did not engage in any such "business."

Petitioner confuses § 2778(b)(1)(A) with § 2778(b)(2).[11] Subsection (b)(1)(A) does indeed require that the defendant "engage[ ] in the business of ... exporting ... defense articles." 22 U.S.C. § 2778(b)(1)(A)(i).[12]

. Subsection (b)(2), however, contains no such requirement. Instead, it simply provides that "no defense articles ... may be exported ... without a license ...." 22 U.S.C. § 2778(b)(2). Moreover, case law does not require the government to prove that the defendant engaged in the exportation business to prove a violation of subsection (b)(2). *See United States v. Gregg,* 829 F.2d 1430, 1437 (8th Cir.1987) (holding that "all that the Government needs to prove is that the item exported [is prohibited from exportation] ... and ... that the defendant knowingly and willfully exported it ... without an appropriate license"); *United States v. Beck,* 615 F.2d 441, 450 (7th Cir.1980) (holding that "[t]he illegal act required ... is an export, ... that is, the movement of goods across the international border"); *United States v. Lizarraga–Lizarraga,* 541 F.2d 826, 827 (9th Cir.1976) (applying 22 U.S.C. § 1934 (the predecessor statute of § 2778) to an

---

11. The indictment does not specify any subsection.

12. The relevant part of subsection (b)(1)(A) was renumbered in 1996 as subsection (b)(1)(A)(i).

isolated act of importation that was not done as part of a business); *Samora v. United States,* 406 F.2d 1095, 1097 (5th Cir.1969) (rejecting the argument that the "language of subsection (b) of § 1934 causes the statute to reach only one who engages in the business of ... exporting [defense articles]") (internal quotation marks omitted); *United States v. Obiechie,* 825 F.Supp. 1335, 1341 (N.D.Ill.1993) (holding that "to establish a violation under Section 2778(b)(2), the government must prove that the defendant (1) exported; (2) defense articles ...; (3) without a license; (4) willfully"), *rev'd on other grounds,* 38 F.3d 309 (7th Cir.1994); *United States v. Byrne,* 422 F.Supp. 147, 164 (E.D.Pa.1976) (holding that § 1934 is not limited to those who engage in the business of exporting), *aff'd in part and vacated in part on other grounds,* 560 F.2d 601 (3d Cir.1977).

Thus, Petitioner did not need to be in the business of exporting firearms to have count one apply to him. His attorney did not act unreasonably by not telling him otherwise.

#### b. Count Three

■ Petitioner also argues that count three did not apply to him. Count three charged him with importing a firearm, in violation of 18 U.S.C. § 922(*l*). Petitioner argues that § "922(1) ... required the government to prove that petitioner was ... in the business of importing firearms." (Mot. at 15.)

Petitioner misreads the indictment. The indictment did not charge him with violating subsection (1); no such subsection exists. The indictment charges him with violating subsection (*l*).[13] Subsection (*l*) does not require that the defendant engage in the import business. Subsection (*l*) simply provides that "it shall be unlawful for *any person* to ... bring into the United States ... any firearm." 18 U.S.C. § 922(*l*) (emphasis added). Count three therefore did not require that Petitioner be in the business of

importing firearms. Petitioner's ineffective-assistance claim fails.

#### 2. Petitioner's Claim That His Attorney Failed To File A Timely Motion To Withdraw The Plea

■ For his second ineffective-assistance claim, Petitioner alleges that his attorney did not timely file a motion to withdraw his guilty plea. Petitioner alleges that he repeatedly asked Mr. Leahy to move to withdraw the plea, but Mr. Leahy delayed until only a few days before sentencing. By that time, Petitioner argues, the Court was less likely to grant the motion. *See* Fed. R.Crim.P. 32 advisory committee's notes (stating that a factor to consider in whether to grant a motion to withdraw a plea is the interval of time between the plea and the motion to withdraw); (Sentencing Order at 10 (refusing to allow Petitioner to withdraw his plea partly because of the interval between the plea and the motion)).[14]

Petitioner's claim that his attorney failed to act until a few days before sentencing expressly falls under the plea agreement's waiver provision. Petitioner waived his right to "collaterally attack any proceedings ... *prior to the sentencing hearing.*" (Plea Agreement at 5 (emphasis added)).

Nevertheless, Petitioner can raise his claim if he can fit it within an exception to the rule that waivers are binding. One of these exceptions is where a prisoner raises an ineffective-assistance claim; in certain circumstances, a prisoner can raise such a claim even if the prisoner waived the right to attack the judgment collaterally. The question is whether Petitioner's particular ineffective-assistance claim falls within this exception.

The Ninth Circuit first recognized this exception in *United States v. Abarca,* 985 F.2d 1012 (9th Cir.1993). There, the Ninth Circuit stated in dicta that "we do not hold that [the petitioner's] waiver categorically forecloses him from bringing any section 2255

---

**13.** Petitioner confuses the nonexistent subsection (1) with subsection (a)(1), which does indeed forbid anyone who "engage[s] in the business of importation" from importing firearms without a license. 18 U.S.C. § 922(a)(1). Petitioner's confusion probably stems from the fact that the typewritten numeral "1" closely resembles the letter "1." To avoid this confusion, the Court has italicized the letter "1" in its statutory references.

**14.** Petitioner does not challenge the Court's denial of his motion as such, nor could he: The Ninth Circuit already upheld the Court's denial.

proceeding, such as a claim of ineffective assistance of counsel or involuntariness of waiver ...." *Abarca,* 985 F.2d at 1014.

Subsequently, in *United States v. Pruitt,* 32 F.3d 431 (9th Cir.1994), the Ninth Circuit hinted that courts must construe this exception narrowly. The court stated: "We doubt that a plea agreement could waive a claim of ineffective assistance of counsel based on counsel's erroneously *unprofessional inducement* of the defendant to plead guilty or accept a particular plea agreement." *Pruitt,* 32 F.3d at 433 (emphasis added). This language seems to limit the exception to claims that ineffective assistance caused the defendant to enter the very plea agreement that contains the waiver. The quoted language implies that the waiver would bar a claim that ineffective assistance caused other problems, such as sentencing error.

This narrow approach makes sense in three ways. First, it makes sense as a matter of logic. The question of whether an attorney unprofessionally induced the client to plead guilty implicates the validity of the waiver itself, which means that the Court can consider the issue despite the presence of the waiver. *See Wenger,* 58 F.3d at 282 (stating that "[w]aivers ... must stand or fall with the agreements of which they are a part"). However, this rationale does not apply where counsel's unreasonable performance does not implicate the validity of the waiver.

Second, construing the exception narrowly makes good common sense and benefits defendants in the long run. Otherwise, a prisoner could assert *any* claim in a § 2255 motion, simply by prefacing each argument with the magic words, "My attorney rendered ineffective assistance by ...." This would render these bargained-for waivers (for which the government presumably gives concessions) virtually meaningless. Voicing similar concerns, the Seventh Circuit has stated:

Empty promises are worthless promises; if defendants could [get around] their waivers ... then they could not obtain concessions by promising not to [attack their sentences collaterally]. Although any giv-

en defendant would like to obtain the concession and exercise the right as well, prosecutors cannot be fooled in the long run. Right holders are better off if they can choose between exercising the right and exchanging that right for something they value more highly. [The defendant] exchanged the right to [attack his sentence collaterally] for prosecutorial concessions; he cannot have his cake and eat it too. *Id.* at 282.

Third, limiting review of ineffective-assistance claims makes sense as a matter of judicial economy. Consider the following example: A prisoner might argue that the sentencing court erred by not granting a downward departure for extraordinary family circumstances, and that the ineffective assistance of counsel caused this error. To determine whether the attorney rendered ineffective assistance, the court would have to determine whether the approach the prisoner claims the attorney should have taken would have had merit, i.e., whether the prisoner was entitled to the downward departure. This would be a de facto analysis on the merits, which the court would have to engage in virtually every time a prisoner raised a claim couched in terms of ineffective assistance.[15] This militates against one of the primary purposes of waivers—facilitating the "judicial administrative process." *Baramdyka,* 95 F.3d at 843.

In light of these considerations, the Court holds that a plea agreement's waiver provision bars claims of ineffective assistance that do not implicate the validity of the waiver itself. In the case at bar, Petitioner merely has alleged that his attorney failed to take certain actions *after* he already had pleaded guilty. Petitioner's claim therefore does not implicate the validity of his waiver. Thus, Petitioner's waiver bars him from raising his ineffective-assistance claim.

3. Petitioner's Claim That His Counsel Performed Ineffectively Because Of A Conflict Of Interest

For his third ineffective-assistance claim, Petitioner argues that his attorney had a

---

**15.** An analysis on the merits, of course, is precisely the result that waiver provisions seek to avoid.

conflict of interest that prevented him from vigorously representing Petitioner. Specifically, Petitioner claims that his attorney did not press for a "sentencing trial." Presumably, Petitioner means that his attorney should have urged the Court to take live testimony at the sentencing hearing.[16]

■ To prevail on his conflict-of-interest claim, Petitioner must show that his attorney had an "actual conflict of interest." *Maiden v. Bunnell,* 35 F.3d 477, 480 (9th Cir.1994). An "actual conflict of interest" "squarely place[s] the interests of the client in opposition to those of the attorney, [such that it is] likely to compromise a reasonable attorney's ability to ... represent his client with undivided loyalty ...." *Bonin v. Calderon,* 59 F.3d 815, 827 (9th Cir.1995).

■ In addition to showing an actual conflict, Petitioner must show "that some effect on counsel's handling of particular aspects of the [case] was likely." *Sanders,* 21 F.3d at 1452 (internal quotation marks and citations omitted). "If [Petitioner] makes a sufficient showing under both prongs, 'prejudice is presumed.'" *Maiden,* 35 F.3d at 480 (quoting *United States v. Miskinis,* 966 F.2d 1263, 1268 (9th Cir.1992)).

■ To understand Petitioner's argument, one must understand the backdrop against which sentencing occurred. Sentencing involved numerous legal and factual issues, and required a substantial amount of briefing. In his Objections to the Presentence Report, Petitioner stated: "This court has reserved all day on [the day of sentencing] from 9:00 a.m. in order that the defendant may have a trial on the issue of what sentence is to be imposed by this court. It is anticipated that the following persons will testify ...." (Pet'r's Objs. to PSR at 1.)[17] In a document filed a few days later, Petitioner described the testimony he wanted to present. (*See* Pet'r's Req. for Downward Departures *passim.*)

At a hearing before sentencing, the following dialogue took place:

| | |
|---|---|
| MR. LEAHY: | ... We had ... talked about the possibility, if I felt it—and if my client felt that we needed live testimony, that under certain circumstances you would be willing to allow us— |
| THE COURT: | That's on the 7th of June [1994]. |
| MR. LEAHY: | And we can present live testimony at that time, if we deem it necessary? |
| THE COURT: | You may be permitted.... I will give you time, if your papers demonstrate that it is warranted.... [Y]ou are ... going to have to convince me that it can't be done by affidavit. Because if it can be done by affidavit, supply the affidavit.... You are going to have to play it both ways against the middle. You are going to have your people ready to go on the 7th, because I may say yes, I may say no. And be ready to go.... |

(Tr. of Hr'g of May 3, 1994 at 13–14.)

The Court later denied Petitioner's request to present live testimony; the Court used affidavits instead. *See* U.S.S.G. § 6A1.3 comment. (Nov.1993) (providing that "[w]ritten statements of counsel or affidavits of witnesses may be adequate under many circumstances" to resolve sentencing issues).

Petitioner claims that after the Court denied his request, he urged Mr. Leahy to object to the Court's denial. Petitioner claims that Mr. Leahy responded: "The judge doesn't want to, and I can't make him. I have other cases before him too, you know." (Racich Aff. at 22.) Petitioner claims that Mr. Leahy's statement exhibits a conflict of interest that prevented Mr. Leahy from vigorously urging the Court to take live testimony.

Petitioner's argument fails. Mr. Leahy's statement hardly evidences an "actual conflict of interest" that "squarely place[s] the interests of the client in opposition to those of the attorney ...." *Bonin,* 59 F.3d at 827. Mr. Leahy's comment merely represents an unwillingness to make a nuisance of himself by making a futile objection after the Court already had ruled. Petitioner has failed to establish an "actual conflict of interest."

Moreover, the existence of other clients does not seem to have affected Mr. Leahy's performance. Mr. Leahy *did* vigorously

---

**16.** Petitioner's waiver applies only to "proceedings ... prior to the sentencing hearing." (Plea Agreement at 5.) Here, Petitioner is arguing that his attorney had a conflict of interest that affected his performance regarding sentencing. This is not covered by the waiver.

**17.** In his § 2255 motion, Petitioner mistakenly claims that the Court made this statement.

urge the Court to take live testimony. In two written submissions, Mr. Leahy referenced the testimony he wanted to present. In addition, he specifically asked the Court to take live testimony. Just because Mr. Leahy did not say "I object" does not mean that he did not vigorously represent Petitioner.

Petitioner's conflict-of-interest claim fails.

### 4. Petitioner's Claim That Counsel's Failure To Raise Several Issues On Appeal Constitutes Ineffective Assistance

For his final ineffective-assistance claim, Petitioner argues that his attorney failed to raise several issues on appeal.[18] Specifically, Petitioner claims that his appellate counsel should have argued: (1) that Petitioner pleaded involuntarily; (2) that the government breached the plea agreement; (3) that defense counsel failed to investigate Petitioner's case, thereby rendering bad advice; and (4) that defense counsel failed timely to move to withdraw the plea.

■ An attorney has no obligation to raise meritless arguments on appeal. Moreover, an attorney need not even raise every potentially meritorious argument because "the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). Thus, an attorney who fails to raise a potentially meritorious issue on appeal nevertheless will "frequently remain above an objective standard of reasonableness." *Id.*

■ Petitioner's appellate counsel did not act ineffectively by not arguing that Petitioner pleaded involuntarily, that defense counsel failed to investigate the case, or that defense counsel delayed in filing the motion to withdraw the plea. The Court discussed those issue at length above, and found that they have no merit.

Moreover, appellate counsel did not act unreasonably by not arguing that the government breached the plea agreement. The

Court addresses that argument below, and concludes that it too has no merit.

Because Petitioner's arguments lack merit, the Court cannot fault his appellate counsel for not raising them. Moreover, even if the arguments might have had some merit, the Court cannot find that appellate counsel acted unreasonably by focusing his energies on other issues. *See id.* Petitioner's ineffective-assistance claim fails.

### D. Petitioner's Claim That The Government Breached The Plea Agreement

For his final argument, Petitioner argues that the Court's refusal to take live testimony at the sentencing hearing amounted to a breach of the plea agreement by the government. Petitioner argues that the breach allows him to rescind the agreement and withdraw his plea.[19]

■ Petitioner's argument fails. As a threshold matter, the Court, rather than the government, refused to take live testimony. The Court was not bound by the plea agreement and therefore could not have breached it. (*See* Plea Agreement at 7 (providing that "[t]his plea agreement is limited to the United States Attorney's Office for the Southern District of California"); Plea Hr'g Tr. at 14 (relating Petitioner's acknowledgment that the plea agreement did not bind the Court)).

Moreover, the plea agreement did not promise Petitioner that he could present live testimony; it contains no such language. Petitioner recognizes this fact, but argues that the plea agreement incorporates the language of a cover letter, which Petitioner claims promised that he could present live testimony.

Petitioner's argument fails for two reasons. First, the plea agreement's clear and unambiguous language refutes the argument that it incorporates the cover letter. The plea agreement states that "[n]o additional promises, agreements, representations, or conditions have been entered into with respect to

---

**18.** Petitioner's waiver does not apply to this claim because the waiver is limited to "proceedings ... prior to the sentencing hearing." (Plea Agreement at 5.)

**19.** Petitioner's waiver does not apply to this claim because the waiver expressly does not cover sentencing issues. Furthermore, a waiver does not bar a claim that the government breached a plea agreement. *See Baramdyka,* 95 F.3d at 843.

defendant John Racich's criminal liability other than those set forth in this plea agreement." (Plea Agreement at 3–4.) Furthermore, Petitioner stated at the plea hearing that no one had "made any promises, other than the plea agreement, that induced [him] to plead guilty." (Plea Hr'g Tr. at 14.) Thus, the plea agreement and plea hearing make clear that the plea agreement is an integrated, final expression of the parties' bargain.

Second, even if the plea agreement incorporated the cover letter, the cover letter did not promise Petitioner that he could present live testimony. The cover letter merely states that "this [plea agreement] adequately takes into consideration [Petitioner's] wish to present mitigating information at the time of sentencing." (Opp'n Br. Ex. H.) "Mitigating information" includes affidavits and other forms of evidence, which Petitioner submitted. *See* U.S.S.G. § 6A1.3 comment. (Nov. 1993).[20]

Thus, the record makes clear that no one breached the plea agreement. Petitioner's claim fails.

**E. No Evidentiary Hearing Is Required**

A court need not hold an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *see also Shah v. United States*, 878 F.2d 1156, 1159 (9th Cir.1989). The Court finds that an evidentiary hearing is unnecessary in the present matter because the records conclusively show that Petitioner is not entitled to relief.

**IV. Conclusion**

For the reasons stated above, the Court denies Petitioner's Motion to Vacate, Set Aside, or Correct Sentence.

IT IS SO ORDERED:

---

20. The Court devoted an extraordinary amount of time and effort to Petitioner's sentencing. The Court rarely issues written orders when it sentences people. In Petitioner's case, however, the Court issued a thirty-nine page written order.